UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SHADHA A.,[1]

                      Plaintiff,

     v.

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.
_____

DECISION & ORDER

20-CV-1535MWP

**PRELIMINARY STATEMENT**

Plaintiff Shadha A. brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income Benefits ("SSI"). Pursuant to the Standing Order of the United States District Court for the Western District of New York regarding Social Security cases dated June 1, 2018, this case has been reassigned to, and the parties have consented to the disposition of this case by, the undersigned.

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 15, 16). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

---

[1] Pursuant to the November 18, 2020 Standing Order of the United States District Court for the Western District of New York regarding identification of non-governmental parties in social security opinions, the plaintiff in this matter will be identified and referenced solely by first name and last initial.

**DISCUSSION**

**I.      Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent

2

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)  whether the claimant is currently engaged in substantial gainful activity;

(2)  if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)  if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations (the "Listings");

(4)  if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity [("RFC")] to perform [his or her] past work; and

(5)  if not, whether the claimant retains the [RFC] to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four; . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

II.     **The ALJ's Decision**

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims. Under step one of the process, the ALJ found that plaintiff had not engaged in substantial gainful activity since August 7, 2013, the application date. (Tr. 619).[2] At step two, the ALJ concluded that plaintiff had the severe impairments of May-Thurner syndrome; left lower extremity deep vein thrombosis ("DVT") and angioplasty; left lower extremity pain and mechanical left sided low back pain with dysesthesia; post-phlebitic syndrome from recurrent DVT; post-thrombotic syndrome; fibromyalgia; chronic pain; spondylosis with radiculopathy and stenosis of the lumbar spine; cervicalgia; bursitis of the left hip; moderate mental retardation; and, depressive disorder. (*Id.*). The ALJ also determined that plaintiff had other impairments that were not severe.[3] (*Id.*). At step three, the ALJ determined that plaintiff did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments in the Listings. (Tr. 619-22).

---

[2] The administrative transcript (Docket ## 10, 11) shall be referred to as "Tr. ___," and references thereto utilize the internal Bates-stamped pagination assigned by the parties.

[3] Two of the non-severe impairments identified by the ALJ – diabetes mellitus and carpal tunnel of the right wrist – were based upon medical records relating to a different individual that were erroneously included in this administrative file. (*See* Tr. 619 (citing Tr. 1056, 1058, 1064, 1070, 1076, 1082, 1088, 1132)).

The ALJ concluded that plaintiff retained the RFC to perform a reduced range of medium work with several restrictions. (Tr. 622-34). With respect to exertional capabilities, the ALJ found that plaintiff was capable of lifting up to twenty pounds continuously and carrying up to fifty pounds occasionally, sitting for up to eight hours at a time, standing for up to two hours at a time and for up to three hours during the workday, and walking for up to three hours at a time and for up to four hours throughout the workday. (*Id.*). The ALJ further concluded that plaintiff was capable of occasionally balancing, crawling, and climbing stairs, but was unable to climb ladders or scaffolds, work at unprotected heights, operate motor vehicles or work around sharp objects or hazardous machines. (*Id.*). With respect to environmental limitations, the ALJ determined that plaintiff could frequently be exposed to respiratory irritants and could occasionally be exposed to temperature extremes. (*Id.*). The ALJ found that plaintiff was illiterate and unable to read, speak or understand English and therefore would require that all work instructions be provided by short demonstrations. (*Id.*). With respect to plaintiff's mental work-related capacity, the ALJ determined that plaintiff was limited to simple routine work involving one or two steps, simple workplace decisions not at a production rate, and minimal changes in workplace processes and settings. (*Id.*). At steps four and five, the ALJ determined that plaintiff had no past relevant work but that, based on plaintiff's age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that plaintiff could perform, such as garment folder, small parts assembler, and hand packager. (Tr. 634-35). Accordingly, the ALJ found that plaintiff was not disabled. (*Id.*).

### III.     Plaintiff's Contentions

Plaintiff contends that the ALJ's determination that she was not disabled is not supported by substantial evidence and is the product of legal error.  (Docket ## 15-1 at 21-35; 17).  Plaintiff challenges the ALJ's RFC determination on the grounds that it is not supported by substantial evidence because the ALJ improperly applied the treating physician rule when evaluating the opinions authored by her primary care physician Rebecca Simons, MD.  (*Id.* at 27-35).  Specifically, plaintiff contends that the ALJ failed to properly evaluate the opinions and failed to provide good reasons for not assigning the opinions controlling weight.  (*Id.*).  She also challenges the ALJ's mental RFC assessment on the grounds that the ALJ failed to give controlling weight to any medical opinion assessing plaintiff's mental capacities and instead formulated an RFC based upon the ALJ's own lay opinion.  (*Id.* at 21-26).

### IV.     Analysis

An ALJ should consider "all medical opinions received regarding the claimant." *See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d)[4]).  Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Colgan v. Kijakazi*, 22 F.4th 353, 360 (2d Cir. 2022) ("[p]ut another way, the rule requires the ALJ to defer to the treating physician's opinion when making disability determinations if the opinion is supported by reliable medical techniques and is not contradicted by other reasonable evidence in the administrative record"); *Estrella v. Berryhill*, 925 F.3d 90, 95

---

[4] This regulation applies to claims filed before March 27, 2017.  For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.

(2d Cir. 2019) ("[t]he opinion of a claimant's treating physician as to the nature and severity of an impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record") (internal quotations and brackets omitted).  Thus, "[t]he opinion of a treating physician is generally given greater weight than that of a consulting physician[] because the treating physician has observed the patient over a longer period of time and is able to give a more detailed picture of the claimant's medical history."  *Salisbury v. Astrue*, 2008 WL 5110992, *4 (W.D.N.Y. 2008).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion."  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must explicitly consider the "*Burgess* factors":

(1) the frequency of examination and length, nature, and extent of the treatment relationship,

(2) the amount of medical evidence supporting the opinion,

(3) the consistency of the opinion with the record as a whole,

(4) whether the opinion is from a specialist, and

(5) whatever other factors tend to support or contradict the opinion.

*Schillo v. Kijakazi*, 31 F.4th 64, 75 (2d Cir. 2022) ("[e]ven though this list of considerations is established by regulation, we discussed them at length in *Burgess v. Astrue*, . . . and so they are sometimes referred to as the '*Burgess* factors'"); *see also Estrella v. Berryhill*, 925 F.3d at 95 ("[f]irst, the ALJ must decide whether the opinion is entitled to controlling weight[;] . . . if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it[;] [i]n doing so, it must 'explicitly consider' the . . . nonexclusive

7

'*Burgess* factors'"). "At both steps, the ALJ must 'give good reasons in [the] notice of determination or decision for the weight [she] gives the treating source's medical opinion.'" *Estrella*, 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d at 32) (internal brackets omitted); *Burgess v. Astrue*, 537 F.3d 117, 129-30 (2d Cir. 2008) ("[a]fter considering the above factors, the ALJ must comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion[;] . . . [f]ailure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand") (citations and quotations omitted); *Wilson v. Colvin*, 213 F. Supp. 3d 478, 482-83 (W.D.N.Y. 2016) ("an ALJ's failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record") (alterations, citations and quotations omitted). "This requirement allows courts to properly review ALJs' decisions and provides information to claimants regarding the disposition of their cases, especially when the dispositions are unfavorable." *Ashley v. Comm'r of Soc. Sec.*, 2014 WL 7409594, *1 (N.D.N.Y. 2014) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

      The record is unclear as to when plaintiff initiated primary care treatment with Simons, although medical records as early as December 2013 list Simons as plaintiff's primary care provider, and Simons's July 2015 opinion indicates that she had been treating plaintiff for approximately two years by that point. (Tr. 399-400, 444). The record suggests that Simons continued as plaintiff's primary care provider until at least late 2018. (Tr. 946-47). Accordingly, it appears that Simons was plaintiff's treating primary care provider for at least five years.

      During that time, Simons coordinated and monitored plaintiff's treatment for a variety of impairments, including anemia, history of DVT, depression, and complaints of


'*Burgess* factors'"). "At both steps, the ALJ must 'give good reasons in [the] notice of determination or decision for the weight [she] gives the treating source's medical opinion.'" *Estrella*, 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d at 32) (internal brackets omitted); *Burgess v. Astrue*, 537 F.3d 117, 129-30 (2d Cir. 2008) ("[a]fter considering the above factors, the ALJ must comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion[;] . . . [f]ailure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand") (citations and quotations omitted); *Wilson v. Colvin*, 213 F. Supp. 3d 478, 482-83 (W.D.N.Y. 2016) ("an ALJ's failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record") (alterations, citations and quotations omitted). "This requirement allows courts to properly review ALJs' decisions and provides information to claimants regarding the disposition of their cases, especially when the dispositions are unfavorable." *Ashley v. Comm'r of Soc. Sec.*, 2014 WL 7409594, *1 (N.D.N.Y. 2014) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

The record is unclear as to when plaintiff initiated primary care treatment with Simons, although medical records as early as December 2013 list Simons as plaintiff's primary care provider, and Simons's July 2015 opinion indicates that she had been treating plaintiff for approximately two years by that point. (Tr. 399-400, 444). The record suggests that Simons continued as plaintiff's primary care provider until at least late 2018. (Tr. 946-47). Accordingly, it appears that Simons was plaintiff's treating primary care provider for at least five years.

During that time, Simons coordinated and monitored plaintiff's treatment for a variety of impairments, including anemia, history of DVT, depression, and complaints of

cervical and lumbar back pain and left leg pain.  (*See generally* Tr. 387-97, 402-405, 910-22, 940-1161).  With respect to plaintiff's complaints of ongoing leg pain and back pain, Simons made several referrals and ordered diagnostic imaging.  With respect to plaintiff's ongoing depression, Simons's treatment notes suggest that she monitored the condition and requested copies of plaintiff's mental health treatment notes.

For instance, in April 2015, Simons advised plaintiff to follow up with her treating hematologist to determine whether her leg pain was associated with her history of DVT.  (Tr. 387-89).  In June and July 2015, plaintiff underwent a doppler ultrasound and thrombophilia workup to determine the cause of her left leg and knee pain.  (Tr. 503-507).  Her hematologist prescribed gabapentin to address her ongoing left leg pain.  (Tr. 390-91, 538).  During a July 2015 appointment, Simons noted that plaintiff reportedly remained depressed despite receiving ongoing mental health counseling and medication management.  (Tr. 390-91).  Treatment notes suggest that plaintiff typically stayed inside her house and relied upon her husband to complete household chores and childcare responsibilities.  (*Id.*).

On July 31, 2015, Simons completed an employability assessment for plaintiff.  (Tr. 399-400).  Simons indicated that plaintiff had been diagnosed with major depression, anemia, and hyper-coagulative state.  (*Id.*).  Simons opined that the latter two impairments were permanent and that plaintiff's depression was expected to last more than twelve months.  (*Id.*).  With respect to plaintiff's physical limitations, Simons opined that plaintiff was very limited in her ability to lift, carry, push, pull, and bend, and moderately limited in her ability to walk, stand, sit, see, hear, speak, use her hands, and climb.  (*Id.*).  Regarding plaintiff's mental limitations, Simons assessed that plaintiff was very limited in her ability to understand, remember, and carry out instructions, maintain attention and concentration, make simple decisions, interact

appropriately with others, and function in a work setting at a consistent pace, and moderately limited in her ability to maintain socially appropriate behavior and basic hygiene and grooming standards.  (*Id.*).  Simons opined that, "at th[e] time," plaintiff was not able to work in any capacity for at least twelve months.  (*Id.*).

In March 2016, plaintiff returned to Simons after an emergency department visit due to left leg pain.  (Tr. 404-405).  At that time, Simons referred plaintiff to a vascular specialist.  (*Id.*).  Plaintiff returned to Simons in September 2016 complaining of ongoing low back pain, and Simons referred plaintiff to physical therapy and ordered a lumbosacral x-ray.  (Tr. 972-73).  The following month, plaintiff attended another appointment with Simons during which she continued to complain of persistent left leg pain.  (Tr. 970-71).  Simons referred plaintiff to a vascular surgeon for evaluation.  (*Id.*).  Plaintiff returned to Simons in December 2016 complaining of ongoing back pain and numbness and tingling in her legs.  (Tr. 964-65).  Plaintiff reported that physical therapy had not provided any relief.  (Tr. 962).  Simons ordered a lumbosacral x-ray, which demonstrated mild spondylosis and prescribed ibuprofen and cyclobenzaprine.  (Tr. 962, 1008).

In January 2017, vascular surgeon, Linda Harris, MD, performed a left pelvic/leg venogram, diagnosed plaintiff with May-Thurner Syndrome, and inserted a venous stent.  (Tr. 1152).  That same month, plaintiff returned to Simons reporting ongoing low back pain and requesting a referral for an MRI of her lumbar spine, which Simons ordered.  (Tr. 962-63).  The MRI demonstrated minimal lower lumbar spondylosis without spinal canal stenosis or significant neural foraminal narrowing.  (Tr. 1044-45).  After receiving the MRI results, Simons referred plaintiff to an orthopedic physician for evaluation.  (Tr. 958).

Plaintiff attended an appointment with Simons in April 2017 reporting that she was experiencing increasing back pain that she had been advised might be caused or exacerbated by pelvic congestion syndrome. (Tr. 956). Simons noted that plaintiff was being evaluated by specialists for her ongoing back pain and that further evaluation by them was needed. (*Id.*). During an October 2017 appointment, Simons administered a depression screen to plaintiff, which demonstrated that plaintiff suffered from mild depression. (Tr. 952). In April 2018, plaintiff returned to Simons requesting completion of another employability assessment form and referral for another MRI. (Tr. 950-51). During the appointment, Simons noted that plaintiff remained under the care of an orthopedist and indicated that she would contact him to determine whether to order an additional MRI. (*Id.*).

On April 17, 2018, Simons completed another employability assessment form. (Tr. 1608-609). Simons indicated that plaintiff had been diagnosed with depression, chronic pain, and chronic venous clots. (*Id.*). Simons opined that the latter impairment was permanent and that plaintiff's chronic pain and depression were expected to last for more than twelve months. (*Id.*). With respect to plaintiff's physical limitations, Simons opined that plaintiff was very limited in her ability to lift, carry, push, pull, bend, and climb, moderately limited in her ability to walk and stand, and had no limitations in her ability to sit, see, hear, speak, and use her hands. (*Id.*). Regarding plaintiff's mental limitations, Simons assessed that plaintiff was very limited in her ability to function in a work setting at a consistent pace, moderately limited in her ability to interact appropriately with others, and had no limitations in her ability to understand, remember, and carry out instructions, maintain attention and concentration, make simple decisions, and maintain socially appropriate behavior and basic hygiene and grooming standards.

(*Id.*).  Simons opined that plaintiff was "not able to work at this time" – a restriction that she expected would continue for more than twelve months.  (*Id.*).

In her decision, the ALJ acknowledged that Simons had a treating relationship with plaintiff, but accorded her opinions only "some weight" on the grounds that they were completed on check box forms, were expressly limited in duration, and were inconsistent with plaintiff's treatment records and clinical mental status examinations.  (Tr. 632).  Specifically, the ALJ stated:

> Some weight has been accorded to the opinions of primary care treating provider.  Dr. Rebecca Simons, MD, who in July 2015 completed an employability assessment of the claimant . . . outlining moderate limitations in physical functioning aside from lifting, carrying, pushing, pulling and bending, and very limited mental functioning, opining that 'at this time' the claimant would not be able to work in any capacity due to severe depression. . . . Although Dr. Simons is a treating provider, the check box form offers little support and is clearly expressly limited in duration.  Additionally, the assessment is belied by the treatment records, with, as noted above, the correlating clinical mental status examinations . . . reflecting moderate depression overall. . . . Likewise, for the same reasons, the check box assessment completed by Dr. Simons from April 2018, finding that the claimant was very limited again in . . . lifting, carrying, pushing, pulling and bending, along with moderate limitations in walking, standing and sitting and very limited in only one area of mental functioning, her ability to function at a consistent pace and moderate interaction abilities but opining nonetheless that the claimant was not able to work 'at this time' . . . , has been accorded some weight.

(*Id.*).

Review of the ALJ's decision, the record, and Simons's opinions demonstrates that the grounds provided by the ALJ for discounting the physical restrictions assessed by Simons do not constitute "good reasons."  As an initial matter, I disagree that Simons's opinions may be interpreted to suggest that the limitations she identified were "expressly limited in

12

duration." To the contrary, her opinions indicate that each of the identified medical conditions was either permanent or expected to last more than twelve months. (Tr. 399, 1608). Moreover, although she used language such as "at this time" to qualify her opinions regarding plaintiff's ability to work, she indicated in both opinions that plaintiff's work-related restrictions were expected to persist for more than twelve months and answered affirmatively the question on the 2015 form "[b]ased on the evidence available to you, does this individual have severe impairment(s) which has lasted, or is expected to last at least 12 months."[5] (Tr. 400, 1609).

        I also find that the ALJ's one-sentence determination that the limitations assessed by Simons were "belied by the treatment records [and] . . . the correlating clinical mental status examinations [that] reflect[ed] moderate depression overall" is far too conclusory to constitute a "good reason" for discounting the opinions. (Tr. 632). In reaching this conclusion, the ALJ cited approximately 59 pages out of the approximately 1,500 pages of medical records contained in the administrative transcript. These consist of some of Simons's treatment notes and some of plaintiff's mental health treatment notes. (*Id.* (citing Tr. 381-97, 401-405, 406-42)). None of the pages cited by the ALJ postdate 2016, despite the fact that plaintiff continued treatment with Simons until at least late 2018 and the record contains physical and mental health treatment records through early-to-mid 2020. Moreover, review of the cited pages does not readily reveal how, if at all, they are inconsistent with the physical limitations assessed by Simons.[6] Without

---

[5] In response to that question on the 2018 form, Simons responded "NA." (Tr. 1609).

[6] Because I conclude that remand is warranted based upon the record evidence concerning plaintiff's exertional limitations, this decision focuses on the physical limitations assessed by Simons, and I do not reach plaintiff's challenges to the mental portion of the RFC. Nevertheless, I note that in her 2015 opinion, Simons assessed that plaintiff was "very limited" in most areas of mental functioning, while her 2018 opinion assessed that plaintiff was moderately limited in interacting with others and very limited in functioning in a work setting at a consistent pace but not limited in other areas of work-related functioning. (*Compare* Tr. 400 and 1609). The ALJ discounted both opinions on the grounds that they were inconsistent with plaintiff's mental health treatment notes which, according to the ALJ, documented moderate depression overall. As noted, the ALJ supported her finding by citing only a portion of plaintiff's mental health treatment notes. Indeed, elsewhere in the mental health treatment

identifying the alleged inconsistencies in the record, the ALJ has failed to provide any basis for giving less than controlling weight to Simons's opinions. *See Tuper v. Berryhill*, 2018 WL 4178269, *5 (W.D.N.Y. 2018) ("[t]he ALJ's one-sentence explanation for discrediting [the treating physician's] opinions does not satisfy the treating physician rule"); *Erb v. Colvin*, 2015 WL 5440699, *12, 14 (W.D.N.Y. 2015) (remanding where ALJ gave treating physician's opinion "some weight" without providing an adequate explanation for doing so; "the ALJ's statement that the rejected opinions were 'inconsistent with the record as a whole' is too conclusory to constitute a 'good reason' to reject the treating psychiatrist's opinions"); *Marchetti v. Colvin*, 2014 WL 7359158, *13 (E.D.N.Y. 2014) ("[u]nder the treating physician rule, an ALJ may not reject a treating physician's opinion based solely on . . . conclusory assertions of inconsistency with the medical record") (collecting cases); *Ashley v. Comm'r of Soc. Sec.*, 2014 WL 7409594 at *2 ("this . . . conclusory statement about the treatment records fails to fulfill the heightened duty of explanation"); *Crossman v. Astrue*, 783 F. Supp. 2d 300, 308 (D. Conn. 2010) (ALJ's statement that treating physician's opinion was "inconsistent with the evidence and record as a whole" was "simply not the 'overwhelmingly compelling type of critique that would permit the Commissioner to overcome an otherwise valid medical opinion'") (quoting *Velazquez v. Barnhart*, 2004 WL 367614, *10 (D. Conn. 2004)).

The ALJ does note elsewhere in the decision that the severity of the limitations alleged by plaintiff was not supported by "the musculoskeletal and neurological findings" contained in the record and her relatively routine and conservative treatment documented throughout the record. (Tr. 634). Throughout the decision, the ALJ summarized the medical

---

records, plaintiff's depression was rated as moderately severe. (Tr. 1793). In any event, without additional explanation, it is not obvious how the mental limitations assessed by Simons in 2018, which were less severe than those assessed in 2015, are "belied" by plaintiff's mental health treatment records.

records at length, primarily describing plaintiff's physical examinations and imaging in such terms as "no clinical abnormalities," "normal," "benign," "unremarkable," and demonstrating normal gait, station, and range of motion. (Tr. 624-30). Of course, the ALJ's emphasis on the absence of objective findings during clinical examinations ignores that plaintiff was diagnosed with fibromyalgia, a "disease that eludes objective measurement." *Lisa E. v. Comm'r of Soc. Sec.*, 2021 WL 4472469, *7 (W.D.N.Y. 2021) (quotation and bracket omitted) ("[p]ersons afflicted with fibromyalgia may experience severe and unremitting musculoskeletal pain, accompanied by stiffness and fatigue due to sleep disturbances, yet have *normal physical examinations, e.g.*, full range of motion, no joint swelling, normal muscle strength and *normal neurological reactions*[;] [t]hus, lack of positive, objective clinical findings does not rule out the presence of fibromyalgia, but may, instead, serve to *confirm* its diagnosis").

In any event, several of plaintiff's treatment providers assessed positive physical findings upon examination of plaintiff after the application date, including swelling, diminished sensation, stiffness, tenderness, slightly antalgic or wide-based gait, diminished strength, limited range of motion with pain, and positive straight leg raise. (*See*, *e.g.*, Tr. 516, 1093, 1130, 1394-395, 1432, 1436, 1525, 2171, 2179). Although the ALJ acknowledged some of these positive findings, she overlooked others and did not elaborate on the positive findings further in her analysis. Indeed, the most recent imaging of plaintiff's lumbar spine demonstrated a broad-based disc bulge at the L4-L5 level that was effacing and indenting the ventral thecal sac, along with some ligamentum flavurn thickening and posterior facet arthropathy contributing to some mild foraminal and lateral recess stenosis on plaintiff's left side. (Tr. 2180). The imaging also demonstrated a broad-based disc bulge at the L3-L4 level with left-sided foraminal narrowing abutting the exiting L3 nerve root on the left. (*Id.*). As noted by the ALJ, plaintiff's

orthopedic provider opined that the L3-L4 disc bulge did "not really correlate to [plaintiff's] current worst pain and symptoms." (Tr. 629 (citing Tr. 2180)). Overlooked by the ALJ was the provider's additional assessment that the other bulge – at L4-L5 – was the likely source of plaintiff's worst pain and could warrant surgical intervention if epidural injections proved ineffective. (Tr. 2180). On this record, I conclude that the ALJ failed to explain adequately how the limitations assessed by Simons were "belied by the treatment records." (Tr. 632).

The final reason proffered by the ALJ for discounting Simons's opinions was that they were provided in a "check box form." (*Id.*). Of course, "there is no rule that 'the evidentiary weight of a treating physician's medical opinion can be discounted by an ALJ based on the naked fact that it was provided in a check-box form.'" *Schillo v. Kijakazi*, 31 F.4th at 77 (quoting *Colgan v. Kijakazi*, 22 F.4th at 361). Rather, the critical inquiry is whether the opinion is supported by substantial evidence in the record and whether the ALJ has adequately articulated a basis for discounting or rejecting it. *See id.* For the reasons discussed above, I find that the ALJ has failed to articulate "good reasons" for rejecting the opinions authored by plaintiff's treating physician, warranting remand. *See Halloran*, 362 F.3d at 33 ("[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion").

As noted above, plaintiff also challenges the ALJ's determination on the separate grounds that she improperly formulated plaintiff's mental RFC based upon her own lay opinion. (Docket # 15-1 at 21-26). In light of my determination that remand is otherwise warranted, I decline to reach this contention. *See Erb v. Colvin*, 2015 WL 5440699 at *15 (declining to reach

16

remaining challenges to the RFC and credibility assessments where remand requiring reassessment of RFC was warranted). Nor do I agree that remand for calculation of benefits is warranted.[7] Even if the physical limitations assessed by Simons are given controlling weight – a determination that appears to be supported by a thorough review of the record, particularly Dr. Simmons's 2020 treatment records that document a disc bulge as the likely cause of plaintiff's persistent back and leg pain – those limitations alone do not conclusively establish that plaintiff is disabled. Accordingly, remand for further proceedings is warranted. *See Catsigiannis v. Astrue*, 2013 WL 2445046, *5 (E.D.N.Y. 2013) ("upon review of the record, the [c]ourt cannot say that[,] assigning appropriate weight to [plaintiff's] treating physicians[,] there is but one result the law allows[;] [t]herefore, full remand is necessary").

        I note that plaintiff's claim has now been pending for a substantial period of time; she initially filed her application for SSI on August 7, 2013 (Tr. 619), and this is the second time this matter has been remanded by the district court for further administrative proceedings. On remand, the Commissioner is urged to evaluate plaintiff's claim as expeditiously as possible.

---

[7] In support of her argument for calculation of benefits, plaintiff contends that because she is an illiterate younger individual with no prior work history, pursuant to application of the Medical-Vocational Rule (the "Grids") 201.17, the ALJ would have been required to find her disabled if plaintiff were determined to be limited to either sedentary or light work. (Docket # 15-1 at 34). While plaintiff is correct that Grid Rule 201.17 would direct a finding of disabled if she were limited to sedentary work, she is incorrect that this rule directs a finding of disability for individuals capable of light work. *See* 20 C.F.R. Pt. 404, Subpt. P. App. 2, R. 201.17, 202.16. Rather, pursuant to Grid Rule 202.16, a finding of not disabled would be directed if plaintiff were determined to be fully capable of engaging in light work. *See id.* This distinction in the Grids is significant in this case because the Court finds little evidence in the record to support the conclusion that plaintiff is capable of performing the lifting and carrying requirements of medium work. Accordingly, had the Grids directed a finding of disabled if plaintiff were limited to light work, as plaintiff erroneously asserted, remand for calculation of benefits might well have been appropriate.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 16)** is **DENIED**, and plaintiff's motion for judgment on the pleadings **(Docket # 15)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

<div style="text-align:right">

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

</div>

Dated: Rochester, New York
September 30, 2022